IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 SEP 12  PM 3: 48

THOMAS M. GOULD
CLERK, U.S. DISTRICT COURT
W/D OF TN, MEMPHIS

THOMAS P. LEWIS,

    Plaintiff,

v.                                                    No. 02-2958 B

UNITED STATES OF AMERICA,

    Defendant/Third-Party Plaintiff,

v.

RONALD L. EDMONDS,

    Third-Party Defendant.

---

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT OF
THE UNITED STATES, DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE

---

## INTRODUCTION AND BACKGROUND

This action was brought by the Plaintiff, Thomas P. Lewis, on December 13, 2002 against

the United States of America (the "USA" or the "Government"), pursuant to the Internal Revenue

Code, seeking recovery of $2,711.16, plus interest, paid to the USA for employment tax liabilities

and penalties assessed against him.  The USA denied liability and, on February 6, 2003, filed a

counterclaim against Lewis for trust fund penalty assessments in the amount of $4,211,466.27, plus

penalties, interest and statutory additions.  According to the Government, Lewis was the chief

executive officer (CEO), president and a board member of VisionAmerica, Inc. ("VisionAmerica"

or "the Company"), a healthcare entity which provided laser eye surgery through doctor's offices

owned and managed by the Company.  In 1995, the USA alleges that VisionAmerica began to have

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 9-12-05



difficulties in paying employment taxes to the government on a timely basis. It is claimed that the problems worsened until the unpaid tax liabilities reached crisis levels in late 1998 through early 2000, eventually leading to the Company's bankruptcy and liquidation. It has been alleged by the Government that during this period VisionAmerica failed to turn over in excess of $5.5 million in employment taxes. On or about February 12, 2002, the Internal Revenue Service (the "IRS") also assessed against Ronald L. Edmonds, the Company's chief financial officer (CFO), executive vice president and a board member, trust fund recovery penalties related to employment taxes owed by VisionAmerica. A year later, the Government filed a third-party complaint against Edmonds to reduce those penalty assessments to judgment. Before the Court is the USA's motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to the third-party complaint against Edmonds and the counterclaim against Lewis. Also before the Court is the cross-motion for summary judgment filed by the Plaintiff.[1]

## STANDARD OF REVIEW

Rule 56(c) provides that a

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th

---

[1]The USA correctly points out that the cross-motion was filed after the dispositive motion deadline had passed. However, if the Court were to grant the USA's request to deny the cross-motion as untimely, it must also deny the USA's motion, filed a month after the motion deadline, for the same reason. Even though both motions for summary judgment were untimely filed, the Court will nonetheless address the merits thereof, as the trial of this matter is imminent.

Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S.Ct. at 2553. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S.Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## APPLICABLE LAW

The [Internal Revenue] Code requires most employers to withhold Social Security, Medicare, and federal income taxes from their employees' wages. [T]he withheld money is held in trust for the United States until paid to the Treasury on a quarterly basis. The withholding taxes are part of the wages of the employee, held by the employer in trust for the government; the employer, as a function of administrative convenience, extracts money from a worker's paycheck and briefly holds that money before forwarding it to the IRS. A delinquency in trust fund taxes thus is not simply a matter between the IRS and an employer, but rather involves employee wages. The significant responsibility of . . . [an] employer is summed up by then-Judge Cardozo's famous statement that "a trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."

Bell v. United States, 355 F.3d 387, 392 (6th Cir. 2004) (internal citations and quotation marks omitted). "The 'trust fund taxes' are for the exclusive use of the Government and are not to be used

3

to pay the employer's business expenses, including salaries, or for any other purpose." <u>Gephart v. United States</u>, 818 F.2d 469, 472 (6th Cir. 1987). "It is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern -- the government cannot be made an unwilling partner in a floundering business." <u>Kinnie v. United States</u>, 994 F.2d 279, 283 (6th Cir. 1993) (citation omitted).

The penalty established by Congress for an employer's failure to comply with its obligations is a harsh one. Title 26 U.S.C. § 6672(a) provides in pertinent part that

> [a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

The "person" referred to in the statute "is *personally* liable for 100% of the delinquent taxes." <u>Bell</u>, 355 F.3d at 392 (emphasis in original).

> The statute's punitive nature comes not from an increased monetary penalty, as the responsible party is not liable for an amount that is higher than the delinquent tax balance, but rather from personal, as opposed to corporate, liability. Section 6672 thus exists "to protect the government against losses by providing it with another source from which to collect the withheld taxes."

<u>Id.</u> at 392-93 (citing <u>Gephart</u>, 818 F.2d at 473).

Liability under § 6672 is to be imposed in the event an individual meets two requirements. First, he must be a "responsible person" under the statute and, second, he must have willfully failed to turn the tax amount over to the government. <u>Id.</u> at 393; <u>Kinnie</u>, 994 F.2d at 283; <u>McDermitt v. United States</u>, 954 F.2d 1245, 1250 (6th Cir. 1992); <u>Gephart</u>, 818 F.2d at 473. "To obtain a refund of a previously paid assessment, a responsible person has the burden of showing that the assessment

4

is inaccurate, because he has placed at issue an assessment which is presumed correct. This burden entails proving, by a preponderance of the evidence, that he was not a responsible person who willfully failed to pay over the withheld taxes." Bell, 355 F.3d at 393 (internal citations and quotation marks omitted). Therefore, Lewis and Edmonds have "to demonstrate that a genuine issue of material fact exists regarding [their] responsibility for the taxes and [their] willful failure to pay them in order to show" that summary judgment is not appropriate. See id.

As to the first element, the "test for determining the responsibility of a person under § 6672 is essentially a functional one, focusing upon the degree of influence and control which the person exercised over the financial affairs of the corporation and, specifically, disbursements of funds and the priority of payments to creditors." Gephart, 818 F.2d at 473; see also Bell, 355 F.3d at 393 (citing Gephart). The term "person" as used in the Internal Revenue Code "includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b). Facts to be considered in determining whether an individual is a "responsible person" include

> (1) the duties of the officer as outlined by the corporate by-laws; (2) the ability of the individual to sign checks of the corporation; (3) the identity of the officers, directors, and shareholders of the corporation; (4) the identity of the individuals who hired and fired employees; (5) the identity of the individuals who were in control of the financial affairs of the corporation.

Gephart, 818 F.2d at 473. No one factor is dispositive. "The crucial examination is whether a person had the 'effective power to pay taxes.'" McMillan v. United States, Nos. 93-1338, 93-2245, 1995 WL 7977, at *2 (6th Cir. Jan. 9, 1995) (citing McDermitt, 954 F.2d at 1252).

More than one person can be a responsible officer of a corporation. Essentially,

5

> liability is predicated upon the existence of significant, as opposed to absolute, control of the corporation's finances. It is basically a factual inquiry. Generally, such a person is one with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes, or more explicitly, one who has authority to direct payment of creditors.

Gephart, 818 F.2d at 473 (internal citations and quotation marks omitted).

> With respect to the second element--willfulness--the Sixth Circuit has instructed that

> [u]nder our basic definition of willfulness, a responsible person who makes a deliberate choice to voluntarily, consciously, and intentionally pay other creditors rather than make tax payments is liable for willful failure. The responsible party need not exhibit an intent to defraud the IRS or some other evil motive; all that is necessary to demonstrate willfulness is the existence of an intentional act to pay other creditors before the federal government.

Bell, 355 F.3d at 393 (internal citations and quotation marks omitted) (citing Collins v. United States, 848 F.2d 740, 742 (6th Cir. 1988)).  A showing of willfulness "requires either actual knowledge or a reckless disregard of 'facts and known risks that the taxes were not being paid.'" United States v. Valleau, No. 97-2313, 1998 WL 939840, at *2 (6th Cir. Dec. 21, 1998) (citing Calderone v. United States, 799 F.2d 254, 259-60 (6th Cir. 1986)). "[P]roof of a responsible person's knowledge of payments to other creditors" and "awareness of the failure to pay the trust fund taxes" is sufficient to trigger liability. Bell, 355 F.3d at 393. In Bell, the Sixth Circuit noted that this is true even if the "responsible person" is a "sympathetic figure." The court cited to Collins, in which it found that "even though the plaintiff was a sympathetic figure, who relied on another's promise to pay off the taxes, he still acted willfully because he knew that the taxes were not being paid and he diverted funds, which could have been used to offset the tax debt, to cover other business expenses." Id. at 393-94 (citing Collins, 848 F.2d at 742) (internal quotation marks omitted). Bell also made reference to Gephart, holding that "a corporate general manager willfully failed to pay the trust fund

taxes, even though the manager might have been fired for disobeying his superior's orders not to pay the taxes, because the manager was aware of an unpaid tax debt yet continued to disburse funds to other creditors." Id. at 394 (citing Gephart, 818 F.2d at 475). Furthermore, the court noted in Bell that "a responsible individual is willful if he fails to use *all unencumbered funds* that come into his possession thereafter to pay the delinquent taxes." Id. (citations and internal quotation marks omitted) (emphasis in original).

## FACTS, POSITIONS OF THE PARTIES AND ANALYSIS

The gravamen of the USA's position in this case is that Lewis and Edmonds were both officers of VisionAmerica and, thus, "responsible persons" for purposes of the statute and that they, in such capacities, failed to pay the employee payroll taxes. Not surprisingly, both Lewis and Edmonds seek to lay responsibility squarely--and exclusively--at the feet of the other. Clearly, however, the responsible person is not limited to one person in a company. Rather, there are usually multiple responsible persons in any company, all of whom are intended to be snared by the statute's broad net. See Plett v. United States, 185 F.3d 216, 218-19 (4th Cir. 1999). The Court will first apply the foregoing principles to Edmonds.

Edmonds worked for the Company from 1992 to 2000, during which time he acted as senior vice president, executive vice president and CFO. (USA's Statement of Undisputed Facts ("USA Facts"), Ex. 1 (Dep. of Ronald Edmonds ("Edmonds Dep.") at 16-17)) From 1993 to 2000, he also served as a director and the secretary of VisionAmerica. (Edmonds Dep. at 17) According to the Company by-laws, the duties of the CFO were as follows:

> The Chief Financial Officer shall have the general care and custody of the funds and securities of the Corporation, and shall deposit all such funds in the name of the Corporation in such banks, trust companies or other depositories as shall be selected

by the Board. He shall receive, and give receipts for, moneys due and payable to the Corporation from any source whatsoever. He shall exercise general supervision over expenditures and disbursements made by officers, agents and employees of the Corporation and the preparation of such records and reports in connection therewith as may be necessary or desirable. He shall, in general, perform all other duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to him by the Board.

(USA Facts, Ex. 8 (By-Laws of Omega Health Sys., Inc.[2] (the "By-Laws") at § 4.12)) Edmonds had

undisputed authority to open bank accounts and sign checks on behalf of VisionAmerica. (USA

Facts, Ex. 4 (Dep. of Andrew Miller, Sr. ("Miller Dep.") at 25 and Ex. 9 at 3); Edmonds Dep. at 30)

His name appeared on the signature cards of Company bank accounts. (Edmonds Dep. at 29-31)

He, along with Lewis, was authorized to withdraw money from VisionAmerica accounts. (Edmonds

Dep. at 30-31; USA Facts, Ex. 7 (Dep. of Tina M. Traster[3] ("Traster Dep.") at 26)) Although it is

not disputed that Edmonds possessed the authority to negotiate and sign contracts on behalf of the

Company, he insists he only signed contracts the board had approved and directed him to execute.

(Edmonds Dep. at 35) In addition, he participated in Company purchases. (Edmonds Dep. at 37)

Until his resignation in 2000, Edmonds also signed various Securities and Exchange Commission

filings on behalf of VisionAmerica and placed his signature on representation letters required by the

Company's auditor, KPMG, certifying that the accounting records presented were complete and

accurate to the best of his knowledge. (Edmonds Dep. at 39-40; Miller Dep. at 29)

    In his deposition, Andrew Miller, Sr., who had served as the Company's chairman of the

---

[2]Even though the By-Laws are not designated in the body thereof as those of VisionAmerica, the parties refer to them as such in their submissions to the Court. In its motion for summary judgment, the USA advises that VisionAmerica was formerly known as Omega Health Systems, Inc. (USA's Mem. in Supp. of Mot. for Summ. J. at 3 n.1)

[3]According to the pleadings, Traster was a former accounts payable clerk in the Company's accounting department.

board and member of the executive and audit committees, stated that Edmonds had the authority to prioritize payments to creditors and explained as follows:

Q:  You said he had relationships with banks.  What was his function with the banks?

A:  Well, we had both depositary -- depository responsibilities as well as lending responsibilities, relationships with banks.  So our -- maintaining our relationship with them in terms of making sure they were aware of the financial position of the company and what was happening and what our lending needs were as well as our banking needs, etc.  That would be it.

Q:  Well, what was Mr. Edmonds' participation in that?

*     *     *

A:  Well, he would call on banks and arrange lines of credit, borrowings, negotiate the terms of those -- that would be it, I would think.

(Miller Dep. at 24-25)

In April 1999, the Company issued a restatement of earnings previously reported for 1998 to the tune of $1.5 million, resulting from a mistake blamed on Edmonds.  The incident led to a realignment of VisionAmerica's accounting department.  (Third-Party Def. Ronald Edmonds's Resp. to the United States' Statement of Undisputed Facts, Ex. B (Dep. of Todd Smith ("Smith Dep.") at 116-18); USA Facts, Ex. 2 (Dep. of Bethany Harden[4] ("Harden Dep.") at 18-20))  As a result, Todd Smith was placed in the newly-created position of chief accounting officer and began reporting directly to Lewis.  (Harden Dep. at 19-20, Dep. of Thomas Lewis ("Lewis Dep.") at 97)  According to Lewis, "the internal accounting of the day-to-day operations of the company were shifted from [Edmonds'] responsibility to Todd Smith's responsibility."  (Lewis Dep. at 97)  Smith testified in his deposition that after July 1999, when he officially ascended to the position of chief accounting

---

[4]Harden acted as controller for the Company after July 1999.

officer, Edmonds was no longer involved in negotiating loans on behalf of VisionAmerica and that, indeed, his authority diminished after that time. (Smith Dep. at 197) It is the contention of Edmonds that a transition period took place between March through July 1999 wherein Smith took on more responsibility in the accounting department. (Edmonds Dep. at 28-29)

According to Miller, however, Edmonds, during his entire tenure at VisionAmerica, "continued to be responsible for the treasury functions, allocation of cash, flow of cash, management of cash." (Miller Dep. at 23) Lewis testified that "while there were some structural changes made . . . to [Edmonds'] responsibilities, none the less, he was retained as chief financial officer." (Lewis Dep. at 97) Board member Donald Beisner had a similar recollection, stating in his deposition that from 1998 through 2000 it was Edmonds' duty to direct payment to creditors. (Third-Party Def. Ronald Edmonds's Resp. to United States' Mot. for Summ. J., Ex. H (Dep. of Donald H. Beisner ("Beisner Dep.") at 41) He denied that Edmonds' authority changed from 1998 to 2000, explaining that "[w]hen [the mistake leading to the restatement of earnings] was uncovered, the Board voted to remove him from office and we later found out that he was retained as a consultant because he knew too much about the Company. And, as far as I know, he still had those privileges and duties after March of 2000." (Beisner Dep. at 41) Smith's deposition testimony falls into line with the foregoing. He stated that, after he became chief accounting officer, Edmonds continued as CFO and retained the authority to direct and decline payments to creditors and to manage cash flow. (Smith Dep. at 200-01) He denied signing any checks whatsoever until Edmonds left the Company, which he recalled to be around December 1999.[5] (Smith Dep. at 28)

---

[5]Robert Walker, counsel to VisionAmerica, indicated in a report to the Company's board of directors, which is discussed at some length later in this opinion, that "It is significant that Ron and Tom Lewis were the only corporate check signers, and therefore, the other persons [in the

10

Edmonds has contended that, in his capacity as CFO, he was only responsible for certain aspects of cash flow management, and reiterated that his duties diminished with the appointment of Todd Smith to the position of chief accounting officer. (Edmonds Dep. at 25)  In support of his argument that he was not a responsible party during the relevant time period, Edmonds submits that the IRS itself acknowledged that Smith managed the accounting department personnel and was in charge of budgeting, citing the August 2000 IRS Recommendation re: Trust Fund Recovery Penalty Assessment prepared by LaVerne Gentry, the IRS officer assigned to the case.  (Third-Party Def. Ronald Edmonds's Resp. to United States' Mot. for Summ. J., Ex. F (Dep. of LaVerne Gentry ("Gentry Dep.") at Ex. 4 p. 3))  Edmonds reference here is a curious one, however, as Gentry's entry on the form concerning Smith stated in its entirety that he "could not direct payment of bills, or negotiate large contracts, loans, or purchases.  [Smith] had authority to sign checks but did not. [Smith] managed the accounting dep[artment] personnel and was in charge of budgeting." (Gentry Dep. at Ex. 4 p. 3)

The accounting department, under the supervision of Edmonds, was responsible for payment of payroll taxes. (Edmonds Dep. at 19)  He avers, however, that, following the restructuring, the department no longer reported to him. (Edmonds Dep. at 20)  It is undisputed that Edmonds had the authority to hire and fire employees of the accounting department prior to the second quarter of 1999. (Edmonds Dep. at 32)  It is further undisputed that Edmonds possessed the authority to direct and

---

accounting department] had no authority to make the [payroll tax] payments.  Todd [Smith] did not become a check signer until the first quarter of 2000."  (Pl. Lewis' Supplemental Mem. Opposing United States' Mot. for Summ. J. and Cross Mot. and Mem. for Summ. J., Ex. (Dep. of Robert Walker ("Walker Dep.") Ex. 1 thereto (Special Report to the Board of Directors ("Special Report") at 6))

decline payment to creditors during that period, and was responsible for paying payroll taxes. (Edmonds Dep. at 27) Again, Edmonds maintains that, after Smith took over the accounting function, decisions as to which creditors were to be paid were made by Smith. (Edmonds Dep. at 64) He acknowledges, however, that he was aware that VisionAmerica failed to pay payroll taxes from the fourth quarter of 1998 through the first quarter of 2000 and that payroll tax deposits were not being made on an ongoing basis. (Edmonds Dep. at 46, 63, 66) He conceded that Beth Porter, former controller of VisionAmerica, came to him with her concerns about the Company's failure to pay the taxes, even as he denied she did not actually report to him at that time, and that he met with her and Smith in November 1999 to discuss the issue. (Edmonds Dep. at 60) He also stated that even after 1999 he was "involved and not dramatically involved" in approving payments to creditors. (Edmonds Dep. at 28)

When asked generally whether notice from the IRS that it might move to seize corporate assets to satisfy a tax liability should be reported to a corporate taxpayer's board of directors, Edmonds replied that "[d]epending upon the materiality, probably yes," but acknowledged that a levy the size of that asserted against the Company should be reported to the board. (Edmonds Dep. at 91-92) He admitted that he made no such report, even though he sat on the board of directors at the time. (Edmonds Dep. at 92) He further conceded that he never told Lewis about the full magnitude of the tax problem. (Edmonds Dep. at 147-48)

In a letter to KPMG, dated November 23, 1999 and signed by Edmonds, Lewis and Smith, the Company represented that it "ha[d] satisfactory title to all owned assets, and there [were] no liens or encumbrances on such assets nor ha[d] any asset been pledged as collateral." (USA Facts, Ex. 31 ¶ 5) As of the date the letter was issued, Edmonds was aware that the IRS had filed a tax lien

against VisionAmerica on October 9, 1999.  (Edmonds Dep. at 38, 86-87)  In his deposition, Edmonds conceded that the statement was inaccurate, explaining that "[t]hese documents are a kind of boiler plate documents.  They're probably viewed less that way today than then, but they're often given to you late in the game, you know, here sign this, and you quickly read them . . ."  (Edmonds Dep. at 130)

Edmonds also admits that he received "many" notices from the IRS of payroll tax delinquencies and of federal tax liens and levies.  He related that he put the notices in a file and did not "take them to the person whose responsibility it was to ensure that the payroll taxes were being paid."  He claimed to not know why he failed to do so.  (Edmonds Dep. at 86-87)  Edmonds conceded that, from the fourth quarter of 1998 to the first quarter of 2000, he was aware that payments were being made to some creditors instead of the IRS.  (Edmonds Dep. at 55)  According to Harden, Edmonds made the decision to pay other creditors and not the IRS.  (Harden Dep. at 95)  It is Edmonds' position that Smith made the decisions as to which creditors would receive payment. (Edmonds Dep. at 64)

Edmonds stated in his deposition that "[d]ealing with the fact of the delinquency was a responsibility that [he] assumed" and that he "was trying to take care of it."  (Edmonds Dep. at 62)  Although after the reorganization of the Company in May 1999, Edmonds considered it his responsibility to "figure out how to get rid of the delinquency," payment of the employment taxes was no longer his direct responsibility. (Edmonds Dep. at 77-78, 97)  It is undisputed that Edmonds made payments to decrease the delinquency. (Edmonds Dep. at 12)  On August 5, 1999, he met with an IRS officer and submitted to him a check for $50,000.  He later made payments to the IRS in the amounts of $250,000 and $216,000. (Edmonds Dep. at 73-75)  Edmonds also had discussions with

13

the IRS concerning ways to improve cash flow and generate cash by selling assets in order that the payroll taxes could be paid.[6] (Edmonds Dep. at 55) While he "[w]orked as hard as he could on the issues that were causing the cash flow . . . crunch," Edmonds did not "go to the people responsible for processing payroll and say start making payments," ostensibly because the accounting department no longer reported to him, but to Smith. (Edmonds Dep. at 81-82)

Edmonds admits he did not direct Gentry to discuss the tax issue with any other employee of VisionAmerica, but argues simply that there is no evidence to establish that he was the person responsible for *all* contacts with the IRS. (Edmonds Dep. at 84) However, in an IRS form completed by Gentry in December 1999 in connection with a "responsible officer interview," Gentry indicated that Edmonds was the only representative of the Company who "handled IRS contacts, such as IRS correspondence, phone calls from IRS, or visits by IRS personnel." (USA Facts, Ex. 9, Form 4180 Report of Interview with Individual Relative to Trust Fund Recovery Penalty at 6) On page 8 of the form, Edmonds affixed his signature thereto, declaring that he had "examined the information given in this statement and, to the best of [his] knowledge and belief, it [was] true, correct and complete." (USA Facts, Ex. 9, Form 4180 Report of Interview with Individual Relative to Trust Fund Recovery Penalty at 8) In the "Additional Comments" section of the form, Edmonds hand wrote the following: "The delinquency arose under my supervision and I am the person responsible. I am taking aggressive action to see that the delinquency is eliminated, as I have discussed with the Agent." (USA Facts, Ex. 9, Form 4180 Report of Interview with Individual

---

[6]The USA avers that Edmonds told the IRS VisionAmerica would begin making timely tax deposits, citing Edmonds' deposition at page 80. Edmonds argues that there is no evidence to support such an assertion. As the USA has failed to attach page 80 to its motion for summary judgment, the Court is unable to consider it.

Relative to Trust Fund Recovery Penalty at 8)

In his response to the motion for summary judgment, Edmonds argues that the statement said nothing about who was actually authorizing payments to creditors from the second quarter of 1999 until his resignation in 2000 or about his actual authority to direct payments to creditors after Smith took over the accounting department. He also insists that the USA has not demonstrated that he was aware of *all* IRS correspondence with the Company.

Edmonds does not challenge his status as a "responsible person" at VisionAmerica through the first quarter of 1999, but argues that he could no longer be categorized as such after the corporate reorganization in the spring of 1999, when he was "cut out of the loop." Viewing the evidence in the light most favorable to Edmonds, however, the Court finds that he has failed to show that he was not a "responsible person" who "willfully" failed to collect or pay over the employment taxes. As for the responsible person factor, the Court's conclusion rests not on the form of Edmonds' employment at VisionAmerica, but on the substance thereof. Even after Todd Smith was hired as the chief accounting officer and duties were reassigned in the spring of 1999, Edmonds continued to serve as CFO of the Company, retained the ability to sign checks on behalf of VisionAmerica, and remained actively involved in determining payments to creditors. Indeed, he appears to have jealously guarded his role in controlling the disbursement of funds, exhibited in part by Porter's reliance on his counsel, instead of Smith's, to deal with the unpaid taxes. The fact that he may not have been alone in that endeavor, but shared some activities with others, including Smith, or was less involved than he had been previously, does not absolve him of responsibility. As the Court has indicated herein, "[h]aving significant control does not mean having *exclusive* control over the disbursal of funds or the final say over whether taxes or bills are paid." Thomas v. United States,

41 F.3d 1109, 1113 (3d Cir. 1994) (emphasis added); see also Gephart, 818 F.2d at 473. Moreover, "Section 6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or the closest control or authority over corporate affairs." Gephart, 818 F.2d at 476. Edmonds' frequent arguments that he was "stripped of authority" after May 1999 are not, in the Court's view, supported by the evidence, including his own deposition testimony and admissions to the IRS. Instead, the evidence, aside from Edmonds' self-serving assertions to the contrary, indicates that, even if he no longer managed the day to day operations of the accounting department after the spring or summer of 1999, he continued to exert control over the Company's major financial decisions. See United States v. Mitchell, 82 F.App'x 781, 785 (3d Cir. 2003) (corporation's president a "responsible person" even though he had previously resigned, as he remained involved in the management of the corporation after his "resignation" date and his own testimony reflected a level of familiarity with the corporation's financial affairs after his "resignation" that could have only come from his continued involvement in the corporation's most important decisions).

Having found that Edmonds was a "responsible person" under § 6672(a), the Court further determines that he willfully failed to collect or pay the employment taxes owed. He has acknowledged that he was aware of the Company's failure to pay the taxes and of its payment of funds to other creditors. Such knowledge in the hands of a responsible person is sufficient to trigger liability. See Bell, 355 F.3d at 393.

The Court now turns its attention to Lewis, CEO and president of VisionAmerica from the fourth quarter of 1998 until the first quarter of 2000. (Lewis Dep. at 10; USA Facts, Ex. 9; Resp. of Thomas P. Lewis to the USA's First Set of Admissions at ¶¶ 2-3.) According to the Company's by-laws, the CEO's duties were as follows:

16

The Chief Executive Officer of the Corporation shall, subject to the control of the Board, in general supervise and control all of the business and affairs of the Corporation. He may sign, with or without the Secretary or any other proper officer of the Corporation, certificates for shares of the Corporation, any deeds, mortgages, bonds, contracts or other instruments which the Board has authorized to be executed, except in cases where the signing and execution thereof shall be expressly delegated by the Board or these By-laws to some other officer or agent of the Corporation, or shall be required by law to be otherwise signed or executed and, in general, perform all duties incident to the office of Chief Executive Officer and such other duties as may be prescribed by the Board from time to time. In the absence of the Chairman, the Chief Executive Officer shall perform the duties of the Chairman.

(By-Laws at § 4.8)

Miller described Lewis' duties thusly:

Q:    . . . [W]as he [(Lewis)] responsible for all business activities of the business?

A:    He was responsible to supervise and control, yes.

Q:    Would that include making sure the corporation paid its payroll taxes?

A:    I assume so.

Q:    Mr. Miller, under the position of CEO, did Mr. Lewis have the authority to sign contracts, deeds, mortgages, and other instruments?

A:    Yes.

Q:    Okay. As chief executive officer did Mr. Lewis have the authority to hire and fire employees?

A:    Yes.

Q:    There's kind of an amorphous clause in [§ 4.8 of the by-laws] that says other authority delegated to him by the board. Do you have any understanding of what authority was delegated to him?

A:    I don't recall any specific authorities that the board delegated to him.

Q:    Would you described Mr. Lewis's powers as broad?

A:    Yes.

17

Q:    Did Mr. Lewis have the authority to sign checks on behalf of VisionAmerica?

A:    Yes, to my understanding.

Q:    Likewise would he have the authority to direct payment to the creditors of VisionAmerica?

A:    That would be my understanding.

Q:    Okay.  What type of financial control did Mr. Lewis have over the corporation?

\*    \*    \*

A:    He was -- well, every employee in the company reported to him directly or indirectly as is typical for a CEO of any corporation.  In terms of the business model, he made changes in that from time to time.  Generally those things would be discussed, if not, indeed, approved at the board level.

Q:    Okay.  You said all the employees reported to him either directly or indirectly.  Did I understand you correctly?

A:    Yes.

Q:    Okay.  Would that also include the CFO, Ron Edmonds, of the corporation?

A:    Yes.  But I do remember at some point in time there was discussion about changing Ron's reporting relationship to report directly to the board of directors. . . . Now, when that happened and how long that lasted, whatever, it in essence made no difference in the day-to-day functioning of the business as best I could determine.

Q:    So in the day-to-day functioning of the business would the CFO still report to the CEO?

A:    Yes.

Q:    I believe there was some point in time where the business model was amended to be more like the ICON business model.  Does that ring any bells with you?

A:    Yes.

Q:    Okay.  Who suggested that amendment?

18

A:    Tom.

Q:    Okay.  And what did that entail?

A:    That was a radical departure from our initial business model for providing Lasix vision correction surgery to patients.  It involved a joint venture with ICON, a company out of Canada.  It involved a change from a full price fee for service approach to a radically discounted model with heavy advertising.  That's about the best I could characterize it.

Q:    Okay.  And Mr. Lewis is the one that suggested and implemented this change?

A:    Yes.

Q:    Okay.  What was Mr. Lewis's authority concerning mergers and acquisitions?

A:    It required board approval. . . . But he initiated all the actions and brought them to the board for a sign-off after everything was worked out.

Q:    When you say "worked out" --

A:    All the details with the -- identifying the prospective practice to be acquired, negotiating with the physician who owned the practice, determining the price to be paid, etc.  All those details were worked out.  It was then presented to either the executive committee in the absence of the board or the full board.

Q:    At that point in time would Mr. Lewis also enter into I think they're called letters of intent?

A:    Uh-huh.

Q:    Would that be done?

A:    I don't recall whether he did letters of intent which were subject to board approval -- . . . before or after board or executive committee approval.  I don't recall.

Q:    Okay.  But he had the authority to go target acquisitions and negotiate contracts.

A:    Right.

\*        \*        \*

19

Q:   . . . In your opinion what amount of authority did Mr. Lewis have over the operations of VisionAmerica?

\*          \*          \*

A:   As CEO he had comprehensive authority to hire and fire and direct the day-to-day affairs of the company. The responsibilities for board approval were limited to mergers and acquisitions, compensation for top executives, selection of auditors, you know, certain very specific areas that required board approval of actions.

(Miller Dep. at 17-22)  According to Edmonds, prior to the changes made in 1999, he reported as an employee to Lewis and as a director to the board. (Edmonds Dep. at 23)  Lewis stated in his deposition that the CFO reported to the board of directors. (Lewis Dep. at 26)  Miller recalled that the decision was made at some point to have Edmonds report directly to the board, as he appeared to be intimidated by Lewis. (Miller Dep. at 88)

Miller also related that both Lewis and Edmonds had the authority to open bank accounts on behalf of the Company. (Miller Dep. at 25-26.)  Lewis does not deny he possessed check-signing authority on behalf of the Company, but stated in his deposition that

> . . . I just so rarely signed checks that I don't know that I ever signed a check that didn't have at least Ron's verbal approval before I signed it. We just didn't do it that way. I did an inventory in '99 with the help of one of the accounting staff people before I left, and, of the approximate 40,000 checks that were signed that year, we could not find any that I had signed, and my guesstimate as to how many I did sign that year would have been -- I would have guessed less than ten. So it was just so rare. The in-house procedures that the accounting department had for documenting check requests and signing them, they could be changing the forms or however they decided to do it internally, and I would never know.

(Lewis Dep. at 19, 43-44)  He further denied having the authority to withdraw funds from Company bank accounts, citing only to Section 4.12 of the By-Laws, which provided that the CFO was to supervise expenditures and disbursements. Lewis admitted, however, that his name appeared on the

20

signature cards for VisionAmerica's bank accounts.  While Lewis does not deny he had the ability to hire and fire certain employees of VisionAmerica, he denied specifically having had the ability to fire the CFO.  He also denied having the authority to direct or decline payment to creditors based on the By-Laws' assignment of that task to the CFO.  Although that may have been true, the deposition testimony of Miller reflects that the ultimate responsibility for payment to creditors rested with the CEO.  (Miller Dep. at 27)  In addition, Lewis' statement in his response to the motion for summary judgment that the deposition of Smith indicates Edmonds had the *sole* responsibility to make payroll tax payments is a slight mischaracterization.  The testimony referred to by Lewis merely reflects that the responsibility was Edmonds', not that no one else in the Company carried any responsibility for the payments.  Lewis also argues in his response that he was "so removed from the bill-paying end of the business that Todd Smith even acknowledged that if Lewis had instructed him to pay one creditor and Edmonds had instructed him to pay another creditor, he would not have automatically obeyed Lewis, the senior executive, but would have paid neither creditor until the matter got resolved."  The page of Smith's deposition upon which the contention is based actually tells a somewhat different tale, stating in its entirety as follows:

Q:    . . . did Mr. Lewis have ultimate authority over the affairs of the company to the extent that the board didn't have authority?

A:    I do not know for sure.  I do not know.

Q:    Mr. -- if during the time you were chief accounting officer and before Mr. Edmonds left, if Mr. Lewis told you to pay Vendor A and Mr. Edmonds told you to pay Vendor B and there was only enough money to pay Vendor A or B, who would you pay?

A:    Well, that situation never happened, so I can't answer that.  But it would be a tough decision.  And I doubt, I doubt I would pay it with the two of them disagreeing.

21

Q:    Good answer.

A:    Try to reach a resolution.

Q:    But you don't have any doubt that Mr. Lewis had at least equal, if not greater, authority to prioritize creditors than Mr. Edmonds did, do you?

A:    Authority? Sure.

Q:    Equal or greater?

A:    Yeah.

(Smith Dep. at 167)

It is undisputed that Lewis placed his signature on the representation letters required by auditor KPMG, which, as previously indicated, were also signed by Edmonds. (Miller Dep. at 29) In her deposition, Porter testified that in early 1996 she received from Lori Jennings, Lewis' secretary, a document from the IRS with a handwritten note in the corner from Jennings which read "Beth, Tom asked if you could respond to this." (USA Facts, Ex. 5 (Dep. of Beth Porter ("Porter Dep.") at 63-66) Porter later returned the document to Jennings with a handwritten note of her own, a copy of which is attached to the USA's motion for summary judgment. The note reads as follows:

> Tom --
>
> Yes, 4th quarter 941 taxes have not been paid in full.  Cash is tight and Ron [Edmonds] has been assuring me we will soon catch up.  I am not sure that I agree with the amount due on this notice as $52,118.74 was paid 1/3/96 -- We are <u>not</u> current for 1st qtr. 1996.

(USA Facts, Ex. 14)  She could not recall whether she at any point gave the letter to Edmonds. (Porter Dep. at 63-67)  Nor did she speak directly with Lewis. (Porter Dep. at 36)  The Government also contends that Lewis knew of the Company's failure to pay taxes in 1998, based on the following deposition testimony of Harden:

A:     Yes. I believe [Tom Lewis] was aware [that there were unpaid payroll taxes] in 1998. Yes.

Q:     Okay. Why do you now say that?

A:     I did not have any one-on-one discussions in 1998 with Tom. But it was not something that I felt was an issue that was unknown to him when I became aware of it, that it was known by Tom and Ron that we were behind in that.

(Harden Dep. at 137-38) In his response to the dispositive motion, Lewis dismisses Harden's comments as mere speculation. She testified further with respect to a November 4, 1999 meeting thusly:

Q:     . . . Now, with regard to the third quarter financial meeting, we've seen documentation today, and you've provided documentation that the IRS issued, that is, the issue with regard to unpaid payroll taxes was raised; correct?

A:     Correct.

Q:     And it's included in the documentation prepared for that meeting?

A:     Yes.

Q:     Did Mr. Lewis register any surprise when that issue was raised at that meeting?

A:     I don't -- I do no believe so.

Q:     Did you get the impression that Mr. Lewis previously had some knowledge of familiarity that there was some issue with regard to unpaid payroll taxes?

A:     Yes.

(Harden Dep. at 198-99) According to Edmonds, the meeting was attended by himself, Lewis, Smith and Harden. (Edmonds Dep. at 61) A list was prepared with issues to be discussed at the meeting. (Harden Dep. at 32) The "IRS Notices" reference on the list stated as follows:

We have received two notices from the IRS over the last month.
The notices are for liens due to unpaid payroll taxes in prior years

23

Large payables amount in our vendor GL to the IRS

(USA Facts, Ex. 15) Edmonds recalled that, while unpaid payroll taxes were one of the issues to be

dealt with, "[t]here was not a great deal of discussion specific to payroll taxes" at the meeting.

(Edmonds Dep. at 61) Apparently, VisionAmerica had been notified by its bank shortly before the

meeting that its account had been levied by the IRS. (Harden Dep. at 71-72) Harden remembered

being concerned enough about the levy to bring it up at the meeting and make sure everyone in

attendance, including Lewis, was aware of it. (Harden Dep. at 74) She further stated that, at the

meeting, Edmonds said that he was talking with the IRS and that he would take care of the problem,

to which Lewis consented. (Harden Dep. at 76)  Following the November 4 meeting, Lewis

instructed Edmonds and Harden to resolve the matter. (Edmonds Dep. at 61-62)

In letters dated November 19, 1999, the IRS notified Edmonds, Lewis, Smith and Harden that

they may be held personally liable for the payroll tax delinquency. Although he admitted receiving

the letter, Lewis was "unsure" of its contents because Edmonds immediately confiscated it, stating

that he was meeting with the IRS. (USA Facts, Ex. 12 (Resp. of Thomas Lewis to the USA's First

Set of Reqs. for Adm. at No. 14.) In his response to the motion for summary judgment, Lewis argues

that "[i]t is not even clear that [he] read the letter . . . before Edmonds physically took" it.

Upon receipt of the notices, the four met again specifically to discuss the tax issue.  Harden

offered the following version of the events surrounding the second meeting:

> A:      We [Harden and Smith] at that point both went and discussed it with Ron
>          Edmonds and said, look what we got in the mail, and we asked what was
>          going on. I remember him taking the letters from me and saying -- my telling
>          him that they've scheduled appointments for us. He took our letters and said
>          he would call and take care of it, not to worry about it, that we wouldn't have
>          to go meet with them, that everything would be okay. After leaving his
>          office, Todd and I then did go and talk with Tom about this and said, we've

just got letters in the mail about this, and he said, I'm surprised -- I think he was surprised, too, that we got the letters, and he checked his mail. I think Lori, his assistant, checked his mail. And he had a letter as well. So we had all gotten letters that day.

Q:  Did you discuss with Mr. Lewis what the letters were about?

A:  Yes, that Ron had said he would take care of it, and at that time Todd and Tom and I discussed the fact that this was what we had just discussed in the quarterly meeting, the stuff that I printed out with the November 4th date, that this is what I had been asking about or raised a concern about in those meetings. That was when Tom said, well, didn't Ron say he would take care of this? Let's bring him in. And Ron came in, said he was going to be calling, like he had told us, and not to worry, and that he may get KPMG involved in it as well to help out, the tax department.

Q:  When you were in the office with Mr. Lewis discussing this, did you specifically discuss payroll taxes?

A:  Yes.

                    *        *        *

A:  . . . we talked about the fact that these were unpaid payroll taxes. I had said do you remember we had the meeting for the third quarter 10-Q and that these were the unpaid payroll taxes that we had discussed then that we had gotten levies on in our account and now we're getting letters? I was getting more and more concerned that things weren't being dealt with or something wasn't being done correctly because things kept escalating, it seemed to me.

(Harden Dep. at 79-82) Similarly, Smith related that

Tom called Ron down to his office and said, you know, what's going on with these (letters from the IRS). And Ron, you know, said, you know, this is just part of their process. I am handling this. And he went -- Ron took our notices from us and said that he was working with the IRS and said he was going to be getting -- probably going to be getting KPMG involved to help us, because we were behind.

(Smith Dep. at 48-49) With respect to the content of the meeting, Smith stated as follows:

Q:  After you received this letter and you were talking with Mr. Lewis and Ms. Harden, did you ever explain to Mr. Lewis what type of tax was at issue?

A:    Yes. I mean, we definitely talked about payroll taxes. And, again, it wasn't the first time we'd talked about them. So, this was not, you know, this wasn't new news, because we had had the meeting, you know, sometime before that or weeks or, you know, a month or whatever before that where we had listed our payroll-tax liability as an issue on this list that was reviewed by Tom.

(Smith Dep. at 50)  Smith also gave the following testimony:

Q:    Concerning the payroll-tax issue, did Mr. Lewis at any point in time express to you that he thought Ron was lying to him?

A:    No. Not that I know. Not that I remember.

Q:    After this issue blew up, did you ever discuss it with Mr. Lewis about what happened?

*       *       *

A:    . . . I do remember one particular time when I was in Tom's office and he, and he asked me to really think hard about what, you know, about this meeting where we had talked about the payroll taxes and whether we had really discussed it as being payroll taxes, because he never -- he claimed that he never really realized that. And he didn't mean to put words into my mouth but wanted me to really think about that. And so, I told him, you know, there was no, no need to be concerned about putting words in my mouth, that I was very clear in my memory of what we talked about, you know, that we had laid all that out.

Q:    I'm sorry. You were clear that you had discussed payroll taxes?

A:    Yes.

(Smith Dep. at 84-85)  This was not the first time Lewis may have questioned Edmonds' credibility. At the time of the 1998 restatement of VisionAmerica's financial statements due to Edmonds' accounting error, it was Lewis' position that Edmonds' credibility had been "compromised" and that he should be replaced.

With respect to the November 19 meeting, Lewis, in his response to the motion, argues that "[a] meeting did take place on November 19, 1999 regarding the IRS letters, but the tax problem was

26

never described as a payroll tax problem. Edmonds never identified the problem as a payroll tax problem. Rather, he again explained that it was a paperwork problem and that he would engage KPMG for help."

The following is the IRS's timeline in this case. On September 20, 1999, the IRS forwarded a request to VisionAmerica that it pay approximately $1.5 million in payroll taxes for the second quarter of 1999. (USA Facts, Ex. 18) The agency sent a notice of federal tax lien to VisionAmerica on October 9, 1999 informing it that the Government had filed a tax lien in the amount of approximately $2.7 million for the fourth quarter of 1998 and the first quarter of 1999. (USA Facts, Ex. 19) On October 25, 1999, a notice of intent to levy approximately $1.5 million for the second quarter of 1999 was sent to the Company by the IRS. (USA Facts, Ex. 20) Union Planters Bank notified VisionAmerica on November 2, 1999 that the IRS had levied its bank accounts in the amount of approximately $150,000. (USA Facts, Ex. 21) A final notice of intent to levy $1.62 million was issued by the IRS on November 17, 1999. (USA Facts, Ex. 22) On November 29, 1999, VisionAmerica was noticed by the IRS that approximately $1.4 million was due for the third quarter of 1999. (USA Facts, Ex. 23) On December 23, the IRS levied the Company's bank account in the amount of $201,000. (USA Facts, Ex. 24)

It is undisputed that both Lewis and Edmonds were informed of the December 23 levy. According to Smith, Lewis' reaction to the levies was to discuss the matter with Edmonds to ensure that it was being handled and to question why the accounts were continuing to be levied. (Smith Dep. at 148) In his response to the motion, Lewis acknowledges that he raised the tax issue with Edmonds but asserted that "he still did not know it was a payroll tax problem. When [he] asked Edmonds for an explanation, he was told to not worry, that the issue was the same tax issue as

described before, and that the corporation would get a refund. Edmonds said that the IRS problem was an IRS error about different subsidiaries' underpayments and overpayments, and that the corporation was actually entitled to a refund."

On March 6, 2000, the IRS issued a final notice of its intent to levy $3.3 million for payroll taxes for the second and third quarters of 1999. (USA Facts, Ex. 25)  VisionAmerica was advised on March 13, 2000 by Union Planters Bank that the IRS had levied its account and that a hold had been placed on the $506,000 contained therein.  (USA Facts, Ex. 26)  In his response, Lewis maintains that directors Miller and Beisner knew about the payroll tax problem as early as March 10, 2000, while Lewis was vacationing abroad, and that neither contacted anyone, including Edmonds, to address the issue; initiated an internal investigation or left a message for Lewis.  In support of his contention, Lewis cite the depositions of Beisner and Miller.  However, a review of the pages indicated by the Plaintiff completely fail to back up his claims.  Indeed, at the cited page in his deposition, Miller testified that, upon receiving information from Beisner that VisionAmerica was delinquent on its payroll taxes, he "called Ron Edmonds to find out about it, to find out if it was true and what the magnitude and extent, etc., was. And, as I say, it was three and a half, four hours before Ron called me back.  And I subsequently determined that he and Tom had been meeting to discuss what to do about this issue." (Miller Dep. at 84)

Lewis was terminated because, according to Miller, the failure to pay the employment taxes occurred while he was CEO and president of the Company (Miller Dep. at 52), explaining that "therefore, a certain responsibility was on his shoulders."  He further stated that "[t]he company believed that the president and CEO of the company was responsible for making certain that payroll taxes were paid and, given the order of magnitude of the shortfall, that he should have been aware

of it." (Miller Dep. at 52) Lewis takes issue with Miller's recollection, pointing to his own deposition testimony in which he related simply that he resigned without being asked to do so. (Lewis Dep. at 118)

Finally, according to the Government, VisionAmerica paid other creditors while failing to pay payroll taxes due. It offers the following facts in support of its argument, all of which are denied by Lewis. In November 1999, the Company generated approximately $6.8 million in cash receipts, paid some $6.7 million to creditors, and retained on hand about $3.2 million in cash at the end of that month. Pursuant to its financial statement for the first quarter of 2000, VisionAmerica had cash receipts of $13.2 million, with $12.2 million in operating expenses and $2 million in corporate expenses. None of the disbursements during that period, the USA contends, were made to the Government. VisionAmerica's bank statement for February 2000, along with copies of checks for that time frame signed by Edmonds, reflect $2.8 million in credits and $2.5 in debits with an ending balance of $386,133.33 in cash. The March 2000 statement and corresponding checks, again signed by Edmonds, show $3.7 million in credits and $3.4 million in debits with an ending balance of $657,909.25.

Viewing the evidence in the light most favorable to Lewis, the Court finds that he has failed to overcome the presumption of correctness in the Government's assessment. He was the CEO, president and a board member of the Company; under the By-Laws, he was to "in general supervise and control all of the business and affairs of the Corporation"; and he could sign checks on behalf of VisionAmerica and hire and fire its employees. The fact that he delegated the tax problem to Edmonds does not wipe the slate clean as far as Lewis is concerned. As the Sixth Circuit articulated in Kinnie, "one who possesses significant control over the company's financial affairs may not escape

29

liability by delegating the task of paying over the taxes to someone else." <u>Kinnie</u>, 994 F.2d at 284. Thus, the Court finds that Lewis was a "responsible person" for purposes of § 6672(a). <u>See Harold v. United States</u>, No. 1:04CV01281, 2005 WL 1719126, at *4 (N.D. Ohio July 22, 2005) (store manager was "responsible person" where he was responsible for overall operations, hired and fired employees, had check writing authority, and had knowledge of the status of monies owed and paid).

The Court further finds that Lewis' failure to see that the taxes were paid was willful. As CEO and president, it is clear that he was aware of the financial strains on the Company. Despite his protestations and self-serving contentions, it is obvious from the deposition testimony of other employees of VisionAmerica that he was informed by these concerned subordinates on more than one occasion that the payroll taxes were not being paid. His apparent choice to turn a blind eye and a deaf ear to these warnings, while shifting the blame to Edmonds, cannot save him from liability. <u>See Harold</u>, 2005 WL 1719126, at *5 (taxpayer acted willfully and with reckless disregard where, even though he may have lacked actual knowledge of nonpayment, he was aware of tax problems and the receipt of notices from the IRS, but assumed matters were being taken care of and did nothing to investigate).

In an attempt to bolster his assertion that he was in fact unaware of the delinquency, Lewis has submitted days prior to trial a supplement to his response to the dispositive motion based on the deposition of Robert Walker. Walker, former general counsel and security attorney for VisionAmerica, was appointed by the Company's audit committee to investigate the circumstances surrounding the unpaid taxes. In his deposition, he recalled that he first learned of the problem from Edmonds while the two lunched with Lewis on March 17, 2000. (Walker Dep. at 37-40) At the time, Walker remembered thinking that Lewis "seemed genuinely surprised" by the revelation.

(Walker Dep. at 40)  During his exit interview five days later, Edmonds advised Walker that he had not told Lewis about the taxes until it came out in the lunchtime conversation.  (Special Report at 6)  Based on Walker's testimony, Lewis maintains that, since he did not know of the delinquency until the mid-March 2000 lunch and resigned shortly thereafter, he would not have had the opportunity or ability to see that the taxes were paid.

A review of Walker's deposition reveals that Lewis' supplemental filing does far more to seal his fate in this matter than promote his cause.  The Special Report prepared by Walker's law firm at the request of the committee, whose members included Beisner and Miller, is particularly damning to Lewis.  Walker described Lewis' role in the tax debacle as follows:

> . . . Taken in the most favorable light, Tom was unaware of this IRS issue until late November, 1999, and even at that time he was not aware that it was a payroll tax issue nor was he aware of the magnitude of it.  He relied on Ron and did not follow up.  Even in the most favorable light, however, there were by then numerous warning signs, including two IRS levies on the bank account and IRS notices to individual Company officers of problems.  These types of things warranted an immediate and detailed investigation into what really was happening.  It is uncontroverted that there was no follow up by Tom.  Taken in the worst light, it could be inferred that from late November 1999, Tom was aware of this issue and failed to disclose this information to the board. . . .

> Based on all the information, the demeanor of the people when they gave me statements, and my general knowledge of the situation, I don't believe that Tom intentionally withheld this information from the Board or the banks or outside auditors.  I do believe that during the fourth quarter of 1999, Tom knew about the cash flow shortages generally, that he was becoming more and more concerned about the Company's direction, and that he disregarded the warning signs around him by not following up on matters that were unusual and seemed to be a problem for the Company.  After knowing of an IRS levy on the Company's bank account and shortly afterwards receiving a personal notice from the IRS of potential individual liability in connection with payroll tax penalties, some action and diligence was dictated.

> . . . I believe that [Lewis'] reliance on Ron and his failure to follow up were not reasonable or prudent.

(Special Report at 6-8)  If anything, the Special Report confirms the Court's conclusion that Lewis had, at worst, actual knowledge that the taxes were going unpaid or, at best, a reckless disregard of facts and known risks that such was the case.  See Valleau, 1998 WL 939840, at *2.

CONCLUSION

Based on the foregoing, the motion of the United States for summary judgment is GRANTED and the cross-motion of the Plaintiff is DENIED.  Consequently, all remaining pending motions in this matter are DENIED as moot and the pretrial conference and trial are to be removed from the Court calendar.  The Clerk is hereby directed to enter judgment for the United States.

IT IS SO ORDERED this 12th day of September, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 133 in case 2:02-CV-02958 was distributed by fax, mail, or direct printing on September 12, 2005 to the parties listed.

---

Scott J. Crosby
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Lindsey W. Cooper
U.S. DEPARTMENT OF JUSTICE
P.O. Box 227
Ben Franklin Station
Washington, DC 20044

Sam B. Blair
BAKER DONELSON BEARMAN CALDWELL & BERKOWITZ
165 Madison Ave.
Ste. 2000
Memphis, TN 38103

Stephen H. Biller
THE BOGATIN LAW FIRM
1661 International Place Dr.
Ste. 300
Memphis, TN 38120

Jason S. Zarin
U.S. DEPARTMENT OF JUSTICE
P. O. Box 227
Ben Franklin Station
Washington, DC 20044

John G. Despriet
SMITH GAMBRELL & RUSSELL, LLP
1230 Peachtree St., N.E.
Suite 3100, Promenade II
Atlanta, GA 30309--359

William Vann Hearnburg
SMITH GAMBRELL & RUSSELL, LLP
1230 Peachtree St., N.E.
Suite 3100, Promenade II
Atlanta, GA 30309--359

Lisa A. Krupicka
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT